## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |
|---|---|
| )  | |
| TYREE MUSIER ) | |
| c/o Melissa Kucemba, Esq. ) | |
| 1500 John F. Kennedy Blvd., Suite 1900 ) | |
| Philadelphia, PA 19102 ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Civil Action Case No. _____ |
| ) | |
| CITY OF PHILADELPHIA ) | **COMPLAINT & JURY DEMAND** |
| 1515 Arch Street, 17ᵗʰ Floor ) | |
| Philadelphia, PA 19102, ) | |
| ) | |
| AND ) | |
| ) | |
| DETECTIVE JAMES BURNS, ) | |
| DETECTIVE CARL WATKINS, ) | |
|  and JOHN DOE 1-5 ) | |
| *in their individual capacities*, ) | |
| Philadelphia Police Department ) | |
| One Franklin Square ) | |
| Philadelphia, PA 19106 ) | |
| ) | |
| *Defendants.* ) | |

_____

## <u>COMPLAINT</u>

Plaintiff, **TYREE MUSIER** ("Mr. Musier"), by and through his attorney, Melissa

Kucemba, Esquire, files this Complaint against the **City of Philadelphia**; **Philadelphia Police**

**Department ("PPD"); and Detective James Burns, Detective Carl Watkins, and John Doe**

**1-5 ("PPD Officers")**, in their individual capacities, for violating Mr. Musier's constitutional

rights and causing his injuries pursuant to 42 U.S.C. § 1983 by withholding exculpatory evidence

in a criminal trial against Mr. Musier that ultimately led to his wrongful conviction, life-without-

parole sentence, and subsequent exoneration and *Nolle Prosequi* of the charges against him. He alleges as follows:

## INTRODUCTION

1. On June 22, 2008, at only twenty-two years old, Mr. Musier was arrested by the Philadelphia Police Department ("PPD") and subsequently charged with first-degree murder and related firearm charges.

2. On April 25, 2012, in the Philadelphia County Court of Common Pleas ("Court of Common Pleas"), Mr. Musier was convicted after a jury trial of one count of first-degree murder and firearm related offenses.

3. Mr. Musier was sentenced to life-without-parole for the murder conviction.[1]

4. Mr. Musier lived under the mental and emotional anguish that he would die while incarcerated.

5. On August 20, 2025, the District Attorney's Office ("DAO") conceded that Mr. Musier was entitled to relief and a new trial due to the totality of the exculpatory evidence that the Commonwealth withheld by and through the DAO and PPD.[2]

6. In Mr. Musier's PCRA re-investigation, it was discovered that not only were recorded jail calls from his co-defendant, Jonte Slater ("Slater"), not turned over by the DAO, but the PPD additionally failed to disclose before or at Mr. Musier's trial additional witnesses,

---

[1] A life-without-parole sentence is a de facto death sentence. *See generally Miller v. Alabama*, 567 U.S. 460 (2012).

[2] In the DAO's Response to Mr. Musier's Amended Post-Conviction Relief Act ("PCRA") Petition, it states, "After an exhaustive and careful review, **and considering all the suppressed evidence in light of the record as a whole, including new witness accounts**, the Commonwealth must conclude that the outcome of Musier's trial is unreliable and that justice requires he receive a new one." *See Commonwealth v. Musier*, CP-51-CR-0015455-2008, Commonwealth's "Response to Petitions for Post-Conviction Relief," at 4 (Aug. 20, 2025).

who have made exculpatory statements and/or were leads to other witnesses. These witnesses include, but are not limited to, Blanche Griffin, David Powell, Jerrica Rogers, Hafees Alston, Billy Slater, and Marquise Astillero. *See Commonwealth v. Musier*, CP-51-CR-0015455-2008, "Amended Petition Under the Post-Conviction Relief Act," at 7 (Nov. 5, 2024).

7. **Blanche Griffin ("Griffin") swears in an affidavit that she told PPD Officers in 2010 that Slater, not Musier, was the killer and that Slater's motive to kill the victim, Nathaniel Crawford ("Crawford), was drug-related (a statement that was never disclosed)**. *Id.* at 23-25; *See also* **Exhibit A**, Griffin Blanche's Affidavit.

8. PPD Officers, including, but not limited to, Detective Carl Watkins ("Detective Watkins") failed to disclose Griffin's name, as well as an exculpatory interview and statements, before and at Mr. Musier's trial.

9. **A Commonwealth witness, Terrell Lewis ("Lewis"), who testified at Mr. Musier's trial, swears in an affidavit that during his second PPD interview in June 2009, Detective James Burns ("Detective Burns") offered to help him on his then-pending criminal cases if he cooperated in the Crawford murder.** *See* "Amended PCRA Petition," at 26-27; *See also* **Exhibit B**, Terrell Lewis' Affidavit.

10. PPD failed to disclose this critical, exculpatory impeachment evidence against Lewis pursuant to Mr. Musier's Fifth Amendment right and *Brady* and its progeny.

11. On August 22, 2025, after considering all the suppressed evidence pursuant to law[3], the Court of Common Pleas granted Mr. Musier's PCRA Petition due to the Commonwealth

---

[3] Materiality of suppressed evidence *must* be "considered collectively, not item by item." *Dennis v. Sec'y, Penn. Dep't of Corrs., 834 F. 3d 263, 312 (3d Cir. 2016) (en banc)* (citing *Kyles v. Whitley*, 514 U.S. at 419, 441 (1995)). This cumulative materiality analysis requires that the

failing to disclose *Brady* evidence and thus violating Mr. Musier's constitutional right to due process under the Fifth and Fourteenth Amendments of the United States Constitution ("U.S. Constitution").

12. The withholding of exculpatory *Brady* evidence, in totality, also violated Mr. Musier's constitutional right to a fair trial pursuant to the Sixth Amendment of the U.S. Constitution.

13. On September 16, 2025, after wrongfully serving 17 years of his life-without-parole sentence in the Philadelphia Department of Prisons ("PDP"), Mr. Musier was fully exonerated via *Nolle Prosequi* and subsequently freed from prison.

14. As a result of his unlawful incarceration, once a fully functional, walking man, Mr. Musier, at only thirty-nine-years-old, is now bound to a wheelchair and unable to care for himself without assistance.

15. Mr. Musier's health drastically deteriorated throughout the course of his wrongful incarceration, and he is now physically disabled.

16. Mr. Musier does not know when he will walk again.

17. Mr. Musier requires surgery if he is to walk again.

18. Due to the numerous medical ailments that were caused by and/or exacerbated by his wrongful incarceration, including, but not limited to, osteoarthritis and extensive and severe bilateral hip degeneration, Mr. Musier struggles to move around his home.

19. The aforementioned has caused Mr. Musier a great deal of mental and emotional anguish.

---

suppressed evidence be considered with all other evidence, old and new, regardless of whether the other evidence is currently before the Court as part of an independent claim for relief. *Glossip v. Oklahoma*, 145 S. Ct. 612, 629 (2025).

20. As further detailed below, this grave miscarriage of justice and Mr. Musier's wrongful conviction were the direct and proximate result of the egregious misconduct by the Defendants pursuant to the unconstitutional and improper policies, practices, and customs of the PPD, including the Homicide Unit. For a period starting as early as the 1970's and continuing through the investigation and wrongful conviction in Mr. Musier's case, Defendants' unconstitutional acts and/or omissions evidences deliberate indifference by the Defendant City of Philadelphia and its individual Defendant PPD Officers to practices of coerced confessions and witness statements, fabrication of evidence, witness intimidation and coercion, suppression of exculpatory evidence, and abuse of authority.

21. As a result, Mr. Musier has suffered debilitating injuries from his wrongful conviction pursuant to 42 U.S.C. § 1983 as further evidenced below.

## JURISDICTION AND VENUE

22. This action is brought pursuant to 42 U.S.C. § 1983 to redress the City of Philadelphia's and its agents' deprivation of Mr. Musier's right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution.

23. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

24. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

25. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because the events leading to this Complaint occurred in this judicial district.

## PARTIES

26. **Plaintiff Mr. Musier** is, and at all times relevant to this Complaint was, a citizen and resident of the State of Pennsylvania. Mr. Musier was born in Philadelphia, Pennsylvania, and he currently resides in Montgomery County, PA. In 2012, Mr. Musier was

wrongfully convicted of one count of first-degree murder and related charges, for which he was sentenced to life-without-parole. As a result, Mr. Musier wrongfully served 17 years of incarceration. Mr. Musier was not released from confinement until he was fully exonerated and the matter was *Nolle Prosequied* on or about September 16, 2025.

27. **Defendant City of Philadelphia** is, and at all times relevant to this Complaint was, a municipality located in the State of Pennsylvania. The City of Philadelphia was, at all times relevant to this Complaint, officially responsible for the policies, practices, and customs of the PPD and was the employer of the individual Defendant PPD Officers in this matter.

28. **Defendants Detective James Burns, Detective Carl Watkins, and PPD Officers John Doe 1-5 ("PPD Officers")**, at all times relevant to this Complaint, were officers, i.e. employees or agents, of the PPD and acting under the law and within the scope of their employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and PPD. Defendants are sued in their individual capacities. They were assigned as detectives with the PPD Homicide Unit at the time of the criminal investigation in the original criminal prosecution and trial against Mr. Musier and at all times relevant to this matter.

29. At all times relevant to this Complaint, the Defendants named above acted in concert and in conspiracy with one another to deprive Mr. Musier of his constitutionally protected rights, including, but not limited to, his right to due process and a fair trial pursuant to the U.S. Constitution.

### FACTUAL STATEMENT AND PROCEDURAL BACKGROUND

I.    **The PPD withheld exculpatory evidence that led to Mr. Musier's wrongful conviction and 17 years of incarceration, for which he has been exonerated.**

A.    ***Evidence presented at Mr. Musier's preliminary hearing and trial failed to include multiple undisclosed witnesses and their exculpatory testimony and impeachment evidence against the Commonwealth's witness, Lewis.***

30.    On June 22, 2008, Crawford was shot and killed. This same day, at only twenty-two years old, Mr. Musier was arrested by the PPD and subsequently charged with first-degree murder and related firearm charges. *See* "Amended PCRA Petition," at 1.

31.    After a preliminary hearing on December 9, 2008, Mr. Musier's co-defendant, Slater, was released from incarceration and "the murder charges against Slater were dismissed for lack-of-evidence." [4] *See Commonwealth v. Musier*, CP-51-CR-0015455-2008, "DAO Letter to Honorable Judge Scott DiClaudio," at 2 (Dec. 23, 2024).

32.    Less than a year after his release, on November 5, 2009, Slater was shot to death, which led to a PPD investigation into his murder. *Id.* at 3.

33.    It was later discovered during Mr. Musier's PCRA re-investigation phase that PPD obtained and suppressed exculpatory evidence, such as additional witnesses, related to Mr. Musier's case while investigating Slater's murder.

---

[4] At the preliminary hearing, only one eyewitness, Latasha Austin ("Austin"), testified, stating that Slater was not the shooter and Mr. Musier was the shooter. This allowed for the charges against Slater to be dismissed for "lack-of-evidence." Austin later recanted her testimony before and at Mr. Musier's trial. She swears in an affidavit she testified against Mr. Musier at preliminary hearing because Slater's associates paid her $2,000 in exchange for her testimony. Had she not lied in her testimony at preliminary hearing and rather testified consistently with her trial testimony, there likely would have been a lack-of-evidence, or insufficient evidence, against Mr. Musier at preliminary hearing, and there is a likelihood that his charges would have been dismissed at the preliminary stage.

34. Slater's homicide file ("H-File") was in the possession and control of PPD during the time of Mr. Musier's pending investigation, before his trial, and at his trial.[5]

35. On February 6, 2012, at Mr. Musier's bench trial, the DAO stated in its opening statement that the Commonwealth witness, Lewis, had falsely identified himself in his statement to PPD.[6] Mr. Musier's defense counsel moved for a mistrial due to this evidence not being disclosed before trial. The Commonwealth conceded, but the mistrial was denied and a continuance for a jury trial was granted.

36. At Mr. Musier's jury trial, Lewis testified that his signed statement to PPD Officers was false and that he did not correct his statement because at the time, he had several outstanding warrants and used a false identity.

37. The only other eyewitness to testify against Mr. Musier at trial was Latasha Austin ("Austin"), who was only fourteen years old when she gave a formal statement to PPD Officers and identified Mr. Musier as the shooter at the preliminary hearing.

---

[5] Pennsylvania courts have consistently held that the prosecution's duty to disclose exculpatory evidence includes evidence in the files of police agencies. For example, in *Commonwealth v. Burke*, 566 Pa. 402, 413 (2001), the Pennsylvania Supreme Court, applying *Kyles v. Whitley*, emphasized that the prosecution's *Brady* obligation extends to exculpatory evidence in the files of police agencies of the same government prosecuting the case. *See also Commonwealth v. Gibson*, 597 Pa. 402, 430 (2008); *Commonwealth v. Christopher Bus*, 2002 Pa. Dist. & Cnty. Dec. LEXIS 326, *5 (June 28, 2002).

[6] Lewis had an open bench warrant at the time, so to evade arrest, Lewis falsely gave the name and information of his friend "Antoine Robinson" to PPD when they first took his statement. This lie was so convincing that at Mr. Musier's preliminary hearing, the Commonwealth attempted to call the real Antoine Robinson. The real Antione Robinson was hauled into court rather than Lewis, and, honestly, testified that he had no idea what was going on. Detective Jim Griffin mistakenly testified at trial that he had interviewed the real Antoine Robinson instead of Lewis. Once it became clear Antoine Robinson was the wrong person, he was excused. *See* Commonwealth's "Response to Petitions for Post-Conviction Relief," at 7; *See also* "DAO Letter to J. DiClaudio," at 2.

38. About two years before trial, on or about October 27, 2010, Austin told then-Assistant District Attorney ("ADA") Jennifer Bretschneider ("Bretschneider") that Slater was the shooter. Austin recanted her identification of Mr. Musier, stating that she initially identified Mr. Musier as the shooter because she was fearful, or felt threatened, of Slater and his friends and family. *See* "DAO Letter to J. DiCaludio," at 2.

39. At trial, Austin testified consistently with her 2010 recantation, stating that Slater, not Musier, was the shooter. *Id.*

40. Austin revealed that she was bribed by Slater to identify Mr. Musier as the shooter. She swears in an affidavit that Slater's associates threatened her and offered her $2,000 to falsely implicate Mr. Musier. *See* "Amended PCRA Petition," at 10-12.

41. On April 25, 2012, in the Court of Common Pleas, Mr. Musier was convicted after a jury trial of one count of first-degree murder and firearm related offenses.

42. Mr. Musier was sentenced to life-without-parole for the murder conviction.

43. Mr. Musier planned to die while incarcerated.

**B. *The initial discovery of undisclosed Brady evidence in the United States District Court for the Eastern District of Pennsylvania led to the vacation of Mr. Musier's wrongful conviction.***

44. On July 10, 2023, Mr. Musier filed a petition for a writ of habeas corpus in this United States District Court for the Eastern District of Pennsylvania ("Federal Court").

45. In response, the DAO reviewed its own files, which turned up an undisclosed memorandum by ADA Bretschneider before she left office. *See* **Exhibit C**, "Bretschneider's Memorandum."

46. On November 17, 2023, the Commonwealth disclosed that it recently uncovered documents in its possession that tended to support the trial defense that Slater was the shooter, thus exculpating Mr. Musier. *See* "Amended PCRA Petition," at 3.

47. On this date, the Commonwealth disclosed for the first time unlawfully withheld *Brady* material, revealing a Commonwealth inter-office memorandum discussing undisclosed jail calls made by Slater and an undisclosed witness that identified Slater as the shooter. *See generally Id.; See also* **Exhibit C.**

48. ADA Bretschneider's Memorandum states that Mr. Musier's case needed a lot of attention and outlined the evidentiary issues with the case, including, but not limited to, Austin's 2010 recantation, issues with the DNA evidence linked to the green shirt the shooter was allegedly wearing[7], and previously undisclosed jail calls that had not yet been fully listened to by the DAO's office or disclosed to defense. *Id*.

49. This memorandum references Slater's open murder case in relation to Mr. Musier's case, stating that one of the witnesses in Slater's case states that word on the street is that Slater murdered Crawford and was letting Mr. Musier take the fall. *Id.*

50. **As a result, this Honorable Court appointed an attorney to represent Mr. Musier in his federal proceedings, which led to additional undisclosed exculpatory evidence, or *Brady*, such as undisclosed witnesses and impeachment evidence, that implicated Slater as the shooter, thus exculpating Mr. Musier.**

---

[7] Eyewitnesses state that the shooter was wearing a bright green shirt, which PPD Officers located in the backseat of the defendants' vehicle and then held up to Mr. Musier's torso for identification purposes. Therefore, both Mr. Musier's and Slater's DNA were found on the shirt. There is evidence that PPD Officers mishandled the shirt. *Id.*

51. On May 6, 2024, Mr. Musier, by and through his counsel, requested that this Honorable Court hold the federal proceedings on the PCRA Petition in abeyance pending the outcome of the proceedings in the Pennsylvania state courts because Mr. Musier learned of new grounds for relief only after reviewing Slater's H-File: "**Petitioner's constitutional right to due process of law at trial was violated by the Commonwealth's failure to disclose the existence of three potential witnesses who could have testified at his trial that Mr. Slater murdered Mr. Crawford and that he [Mr. Musier] had nothing to do with this crime**." *See* "Petitioner's Motion to Hold the Federal Habeas Corpus Proceedings in Abeyance to Permit Exhaustion of New Grounds for Relief in the Pennsylvania State Courts," 2:23-cv-02677-JMY, Doc. No. 16 (May 6, 2024).

52. On May 7, 2024, the Honorable Judge Craig M. Straw stayed the habeas petition so Mr. Musier could pursue his valid claims in the Commonwealth's courts.

53. On November 10, 2024, Mr. Musier, through counsel, filed a second PCRA petition, which ultimately led to his wrongful conviction being vacated and remanded. *See Commonwealth v. Musier*, CP-51-CR-0015455-2008, "Order Granting Post-Conviction Relief Act Petition" (Aug. 22, 2025).

54. On September 16, 2025, Mr. Musier's charges were *Nolle Prosequied* by the DAO, and Mr. Musier was freed from incarceration after spending 17 years under the mental and emotional anguish of planning to die in prison.

11

**C. *The undisclosed Brady evidence withheld by PPD was considered in the totality of Mr. Musier's conviction being overturned and his inevitable exoneration.***

55. On March 4, 2024, the Commonwealth turned over Slater's H-File to Mr. Musier's defense counsel in relation to both Mr. Musier's federal and state claims for relief. *See* "Amended PCRA Petition," at 3.

56. The previously undisclosed file contained about 844 pages. *See* "Third Joint Status Report, 2:23-cv-02677-JMY, Doc. No. 22, at 1 (Oct. 16, 2024).

57. During his PCRA re-investigation, the Commonwealth and Mr. Musier's counsel discovered that Slater was the sole shooter and paid money to the Commonwealth's central eyewitness, Austin, to testify at the preliminary hearing that Musier was the killer and Slater was not. *See* "Amended PCRA Petition," at 1-2.

58. Mr. Musier's PCRA counsel conducted a wide-ranging investigation of dozens of witnesses and documents contained in Slater's H-File, resulting in about thirteen signed affidavits from witnesses. Three of these individuals were eyewitnesses to the murder of Crawford and each of them swears that Musier was not the shooter but that Slater shot and killed Crawford. *See* "Third Joint Status Report," at 2.

59. <u>**Mr. Musier's co-defendant's H-File revealed exculpatory and previously undisclosed witness accounts that are referenced in his post-conviction filings and cumulatively considered in his conviction being vacated.**</u> *See generally Commonwealth v. Musier*, CP-51-CR-0015455-2008, Commonwealth's "Response to Petitions for Post-Conviction Relief" (Aug. 20, 2025).

60. <u>**It is crucial to note Slater's H-File led to undisclosed *Brady* material by PPD. The undisclosed exculpatory evidence found in Slater's H-File revealed a multitude of undisclosed witnesses and leads that included**</u>:

a. **Blanche Griffin**'s undisclosed interview with PPD, in which she told PPD that Slater, not Musier, was the shooter and that Slater's motive to kill Crawford was drug related.

b. **David Powell**, who told PPD that **he saw Slater wearing the bright green shirt earlier the day of the murder,** which was the shirt the shooter wore and used as evidence against Mr. Musier in trial, and who reports he heard rumors that Slater bribed Austin to testify in his favor and against Mr. Musier.

c. **Jerrica Rogers**, the mother of Slater's daughter and his former girlfriend, who swore in her affidavit that **Slater confessed to her that he shot Crawford** and that the cops knew the shooter was wearing the bright green shirt that he owned.[8]

d. **Hafees Alston**, who was with Mr. Musier and Slater the night of the murder, swore in his affidavit that Mr. Musier stayed in the car while Alston and Slater got out near the town houses to drop off Slater's younger brother. **Alston said Slater got into an argument with Crawford and then shot him. Alston said Slater was wearing the bright green shirt** but removed it while he drove away.

e. **Billy Slater**, the father of Slater, who corroborates Jerrica Roger's testimony in his sworn affidavit.

f. **Marquise Astillero**, an undisclosed eyewitness who is not mentioned in discovery and was discovered through the diligent investigation by Mr. Musier's defense counsel during his PCRA re-investigation and who, more importantly, swears in

---

[8] Slater's confessions to his girlfriend that he committed murder and bribery, though hearsay, would have been admissible under Pa. R.E. 804(b)(3) as statements against interest since they exposed him to criminal liability.

his affidavit that **he saw Slater shoot Crawford after a brief argument and that Mr. Musier never got out of the car**.

61. **Griffin's exculpatory 2010 interview and statements were withheld by PPD Officers, including, but not limited to, Detective Watkins, before and at Mr. Musier's trial and have since been discovered in Slater's H-file**.

62. According to the Commonwealth:

"Blanche Griffin states that in 2010, during the investigation into codefendant Slater's murder (and before defendant Musier's trial), she told police detectives that word-on-the-street was that Slater, not Musier, had committed the murder for which Musier was imprisoned. **Notes from the police H-File regarding Slater's murder support that Griffin was interviewed around this time and that Musier's name was mentioned**."

*See* "DAO Letter to J. DiClaudio," at 3.

63. A thorough review was conducted of the turned-over H-File. **It was discovered that the Commonwealth withheld impeachment evidence for their trial witness, Lewis.** Lewis, who originally gave PPD Officers a false name, was also receiving benefits from the Commonwealth in his pending criminal cases for cooperating in Mr. Musier's case.

64. **Lewis swears in his affidavit that during his second police interview in June 2009, Detective Burns offered to help him on his pending criminal cases if he cooperated in the Crawford murder.** *See* **Exhibit B.**

65. There is no evidence that Detective Burns turned over this evidence before or at trial.

66. Withholding this impeachment evidence violated Mr. Musier's constitutional right to a fair trial and fair and full opportunity to cross examine Lewis—who was friends with and sold drugs with the deceased—during trial about his further bias.

67. As ADA Bretschneider stated in her memorandum after leaving her position at the office and transitioning her open files, Mr. Musier's case needed a lot of additional investigation.

68. Had Mr. Musier received the unlawfully withheld *Brady* evidence found in his co-defendant's H-File, i.e. the undisclosed witnesses and related witness statements, as well as the impeachment evidence for Lewis, from PPD before or at the time of his trial as required pursuant to the Fifth and Fourteenth Amendments of the United States Constitution, then Mr. Musier, by and through counsel, would have had the opportunity to fully and fairly investigate his case to present a full and fair trial pursuant to his Sixth Amendment right. This is emphasized by the full and fair investigation conducted by Mr. Musier's PCRA counsel, which led to his wrongful conviction being vacated.

69. As a direct and proximate result of the unlawfully withheld *Brady* evidence by PPD Officers, Mr. Musier served 17 years of his wrongful conviction and de facto death sentence before being fully exonerated via *Nolle Prosequi* in the Court of Common Pleas on September 16, 2025.

70. Without his own due diligence, Mr. Musier would have died incarcerated.

**II.    Mr. Musier's PCRA Petition was granted by the Court of Common Pleas due, in part, to PPD misconduct that resulted in a *Brady* violation, an unconstitutional trial, and wrongful conviction.**

71. The Commonwealth concedes that "[t]hese facts [i.e. the exculpatory witness statements contained within the sworn affidavits], if demonstrated by credible testimony, would have been admissible as substantive evidence to support defense's trial theory that Slater,

not Musier, was the killer, not merely as impeachment evidence." *See* "DAO Letter to J. DiClaudio," at 6.

72. The Commonwealth further states that "[defense] counsel contends that if the Commonwealth had disclosed the tip-off from Blanche Griffin and possibly other witnesses, it would have led reasonable counsel to investigate and discover many of the same witnesses counsel now presents, who would have offered testimony that had a reasonable probability of changing the trial outcome." *Id.* at 7.

73. The Commonwealth concedes that Slater's H-File supports that Griffin was interviewed before Mr. Musier's trial and that Mr. Musier's name was mentioned. *Id.* at 5.

74. It is established that the exculpatory evidence found in the H-File was suppressed by PPD since it was not discovered until Mr. Musier's diligent and thorough PCRA re-investigation by both defense counsel and the Commonwealth that led to Mr. Musier's ultimate exoneration and release from prison.[9]

75. These undisclosed witnesses and leads led to the exoneration of Mr. Musier.

76. Mr. Musier's counsel "interviewed the individuals who provided the following exculpatory evidence completely exonerating Musier and identifying Slater as the real killer." "Amended PCRA Petition," at 7.

77. On August 20, 2025, the Commonwealth filed a Response to Petitions for Post-Conviction Relief, conceding relief for Mr. Musier. The Commonwealth discusses the undisclosed jail calls made by Slater in the months leading up to the preliminary hearing that are referenced in ADA Bretschneider's Memorandum.

---

[9] The standard to show suppression is merely a preponderance of the evidence. 42 Pa. C.S. § 9543(a).

78. In the exculpatory calls that were disclosed by the Commonwealth between April 7 and July 23, 2025, Slater makes incriminating statements against his interest, including:

    a.  He was outside of the car when the shooting happened;

    b.  That the green shirt in question was his "favorite shirt," that he could not believe the police "put the green shirt on Ty," that he's "never going to get that shirt back," and when this is "all over" he's going to tell the police that "it wasn't the big guy's shirt" and ask for it back; and

    c.  That he needed the preliminary hearing witnesses, including Austin, to "show up and say it ain't us" and that, to accomplish this, he was going to offer them $1,000 checks to testify in his favor.

*See* "Commonwealth's Response to PCRA Petitions", at 2.

79. The Commonwealth concedes that "after a careful review of the record and relevant precedent, the Commonwealth is constrained to agree that its suppression of the presented evidence violated *Brady* and to recommend that Musier be granted a new trial…[t]he Commonwealth now believes that Musier's conviction is unworthy of confidence and can no longer defend it." *Id.* at 3.

80. While the Commonwealth and the Court of Common Please focus only on the jail calls in terms of granting Mr. Musier relief and thus mooting his other claims for relief, the **Commonwealth states that "[a]fter an exhaustive and careful review, and considering all the suppressed evidence in light of the record as a whole, including new witness accounts, the Commonwealth must conclude that the outcome of Muser's trial is unreliable and that justice requires he receive a new one."** *Id.* at 4.

17

81. In its Response, the Commonwealth notes that although it only responds to the merits of Mr. Musier's newest *Brady* claim, i.e. the undisclosed jail calls by Slater, **the contents of the newly produced witness affidavits are relevant to the cumulative materiality analysis that *Brady* requires**. *See Glossip v. Oklahoma*, 145 S. Ct. 612, 629 (2025) (noting that a cumulative materiality analysis requires consideration "of all the evidence, whether or not that evidence is before the Court in the form of an independent claim for relief").

82. Materiality of suppressed evidence must be "considered collectively, not item by item." *Dennis v. Sec'y, Penn. Dep't of Corrs.,* 834 F.3d 263, 312 (3d Cir. 2016) (en banc) (citing *Kyles v. Whitely,* 514 U.S. 419, 441 (1995).

83. **At no point before or during Mr. Musier's trial did PPD Officers supply the DAO with the exculpatory interview from Blanche or the true nature of the benefits received by Lewis in exchange for his testimony, nor any of the additional witnesses mentioned throughout Mr. Musier's PCRA filings.**

84. The Commonwealth highlights that their case at Mr. Musier's original trial *already* suffered from weaknesses from conflicting or shifting witness testimony and a lack of physical evidence connecting Musier to the gun. *See* "Commonwealth's Response to PCRA Petitions," at 39-40.

85. The Commonwealth concedes in its Response that the "suppressed jail calls fully support Musier's trial defense" and that "disclosure of this evidence could have not just supported Austin's recantation and called the prosecution's theory of the case into question, as well as the overall investigation, but also could have led the defense to uncover witnesses…." *Id.* at 31. Those witnesses were found in Slater's H-File.

86. The Commonwealth states that "[h]ad these calls been disclosed, they also would have allowed Musier to call Jerrica Rogers and Hafees Alston as his own rebuttal witness, in addition to providing bases for further questioning of Officer Depallo, who put the shirt on Musier at the show-up." *Id.* at 37.

87. The Commonwealth states that these jail calls also tend to corroborate David Powell's ("Powell") signed affidavit alleging that he was with Slater the night of the murder and Slater was wearing the green shirt. *Id.* at 37.

88. **PPD Officers failed to turn over witness Powell's name before or at Mr. Musier's trial.**

89. Considering the totality of the suppressed evidence and the trial record as a whole, the Commonwealth agreed that Musier has established *Brady* materiality and recommended to the court that he be granted a new trial. *See Id.* at 42 (citing *Strickland v. Washington*, 466 U.S. 668, 696 (1984)).

90. According to the Commonwealth, Musier's first-degree murder conviction was based on less than overwhelming evidence, hinging on witnesses who offered shifting narratives, little physical evidence, and disputed ownership of the green shirt. All parties now know that the prosecution suppressed a large amount of exculpatory material evidence that would have been favorable to Musier's defense, undercutting the prosecution's case and calling into question the good faith of the larger investigation and show-up identification. *Id.* at 41.

91. If the suppressed *Brady* evidence had been disclosed as required under the law, then Mr. Musier likely would not have been convicted.

92. On August 22, 2025, the Court of Common Pleas vacated Mr. Musier's illegal conviction and ordered a new trial.

**III.    Due to withheld *Brady* evidence, Mr. Musier was fully exonerated via *Nolle Prosequi* and subsequently released from prison confined to a wheelchair.**

93. On September 16, 2025, Mr. Musier was fully exonerated of his wrongful conviction, for which he unlawfully served 17 years of incarceration in the PDP.

94. In turn, the Commonwealth moved for and the Court entered a *Nolle Prosequi*, and Mr. Musier was finally freed from prison.

95. Before his exoneration, Mr. Musier was wrongfully serving a life-without-parole sentence—which is equivalent to a death sentence pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012)—in the PDP.

96. Mr. Musier suffered great mental, emotional, and physical injuries as a result of his death sentence.

97. At twenty-two years old, Mr. Musier walked into the county jail a healthy, young man.

98. At thirty-nine years old, Mr. Musier now suffers from debilitating injuries and is confined to a wheelchair due to inadequate medical care while he was incarcerated.

99. Mr. Musier's continued incarceration exacerbated the injuries he sustained while incarcerated.

100.    Mr. Musier may never walk again.

101.    This in turn will affect Mr. Musier's ability to lead a normal life for a thirty-nine-year-old man as he can no longer care for himself without assistance.

102.    Mr. Musier remained incarcerated on his wrongful conviction during the

death of his father, which compounded his mental and emotional distress and

injuries.

103.    Mr. Musier suffers from osteoarthritis and extensive and severe bilateral hip

degeneration and requires specialized medical attention and treatment, which was

unavailable to him in prison.

104.    Mr. Musier requires surgery to be able to walk again on his own without a

wheelchair or the assistance of a walker.

105.    Due to his poor diet while incarcerated and not getting proper nutritional

needs, Mr. Musier now has diabetes and is morbidly obese. While incarcerated, Mr.

Musier did not have access to an adequate diet for his body's specific needs.

106.    Mr. Musier's continued incarceration due to his wrongful conviction and de

facto death sentence exacerbated his medical illnesses and injuries.

107.    This grave miscarriage of justice was the direct and proximate result of egregious

misconduct by the Defendants.

108.    Mr. Musier's wrongful conviction was the direct and proximate result of the

unconstitutional and otherwise improper policies, practices, and customs of the PPD,

including the Homicide Unit, which, for a period starting as early as the 1970's and

continuing through the investigation in this case, evidences deliberate indifference and

negligence by the City of Philadelphia to practices of fabricated evidence, including

coerced witness statements, witness intimidation, suppression of exculpatory evidence,

and abuse of authority.

109.    Mr. Musier respectfully seeks redress for the grave injuries he sustained as the

result of Defendants' unconstitutional misconduct.

## DAMAGES

110.     The Defendants' unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions caused Mr. Musier to be improperly arrested and incarcerated, unfairly prosecuted and tried, wrongfully convicted and ordered to a life-without-parole sentence, and forcibly and wrongfully confined for 17 years of his life in the PDP for a 2008 murder he did not commit.

111.     During his incarceration, Mr. Musier developed and suffered from, including, but not limited to, diabetes, bilateral primary osteoarthritis, extensive and severe bilateral hip degeneration, asthma, obesity, hypertension, hyperlipidemia, venous insufficiency, gastroesophageal reflux disease, and an overactive bladder and was unable to receive proper and specialized medical treatment in the community or be with familial support.

112.     On May 1, 2023, Mr. Musier filed a complaint[10] in the Huntingdon County Court of Common Pleas for Huntingdon State Correctional Institution ("SCI-Huntingdon") violating his rights under the Eighth and Fourteenth Amendments of the U.S. Constitution by placing him in solitary confinement and denying him treatment. *See* **Exhibit D**, *Musier v. MHM, Inc., et al.*, 1:23-cv-01047-YK-LT, "Memorandum," at 1 (Jan. 18, 2024).

113.     In his 2023 complaint, Mr. Musier states that he sought drug treatment several times at SCI-Huntingdon between 2017 and 2022, but prison staff repeatedly told him that he is not eligible for treatment because he is serving a life sentence. *Id.* at 1-2.

---

[10] Mr. Musier's complaint was eventually dismissed without prejudice by the court in response to Mr. Musier's Motion to Dismiss on January 18, 2024. Mr. Musier did not file an amended complaint because at the time, he was focusing on his 2023 federal habeas petition to overturn his wrongful conviction.

114.     Rather than receiving treatment, Mr. Musier was sent to the Restricted Housing

Unit ("RHU"), where he suffered a panic attack due to the stress of remaining in the

RHU, which resulted in him being transferred to an outside hospital for treatment. *Id.*

115.     During his hospital stay from September 11, 2022, to September 27, 2022,

hospital staff informed Mr. Musier that he had contracted clostridioides difficile ("C.

diff."), a potentially dangerous bacterial infection. Mr. Musier's 2023 complaint alleges

that he contracted C. diff. as a result of eating meals from the prison's provided meal

trays. *Id.* at 2.

116.     In April 2025, Mr. Musier had a twist and fall injury while incarcerated. He was

taken to the medical room, where X-rays were taken and a wheelchair was provided.

117.     At only thirty-nine years old, Mr. Musier is now confined to a wheelchair and

requires assistance from loved ones to walk, get in and out of his home, bathe, and

perform other daily tasks.

118.     Since his release from incarceration, on a daily basis, Mr. Musier experiences

balance issues and severe pain in his hips when he attempts to walk.

119.     Mr. Musier's condition requires surgery.

120.     Mr. Musier has attended physical therapy to aid him with his physical ailments.

However, physical therapy alone cannot cure his injuries.

121.     Mr. Musier attends talk therapy on a regular basis to aid him with the mental and

emotional trauma he suffered and continues to suffer from due to his imprisonment.

122.     Mr. Musier suffered and continues to suffer from the mental, emotional, and

physical anguish and injuries from his de facto death sentence as a direct and proximate

result of his wrongful conviction. The mental anguish and emotional distress that comes

with serving a life sentence without the eligibility for parole, or death sentence, only exacerbated Mr. Musier's injuries.

123.    During his incarceration, Mr. Musier's father passed away in 2021, which caused and still causes Mr. Musier grave pain and suffering, including, but not limited to, mental anguish and emotional distress.

124.    Mr. Musier was denied the ability to be with his family and loved ones as he was forced to come to terms with the fact that he lost his ability to walk as a direct and proximate result of his wrongful conviction.

125.    Until his release in September 2025, Mr. Musier suffered great mental anguish and emotional pain and suffering as a result of his death sentence.

126.    As a direct and proximate result of Defendants' conduct and omissions, Mr. Musier sustained injuries and damages, including loss of his freedom, loss of his youth, pain and suffering, mental anguish, emotional distress, degradation, indignities, permanent loss of natural psychological and physical development, inadequate medical treatment, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational and vocational opportunity, personal fulfillment, sexual activity and reproductive freedom, family relations and support, travel, enjoyment of life, freedom of speech, expression, and association.

127.    As a direct and proximate result of Defendants' conduct and omissions, Mr. Musier was deprived of his familial relationships, including with his now-deceased father.

128.     As a direct and proximate result of Defendants' conduct and omissions, Mr.

Musier sustained economic injuries and damages, including loss of income and loss of

career opportunities.

129.     Mr. Musier lost the ability to provide for his family, including his mother, three

sisters, and nieces.

130.     As a direct and proximate result of Defendants' conduct and omissions, Mr.

Musier sustained physical injuries and damages, including, but not limited to, physical

pain, suffering, illness, and inadequate medical care for his disabilities.

131.     Mr. Musier's injuries and damages were foreseeable to Defendants at the time of

their acts and omissions.

132.     All the acts and omissions committed by Defendants were done intentionally,

unlawfully, wantonly, recklessly, negligently, and/or in bad faith.

## **CAUSES OF ACTION**

**COUNT I:  42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law
and Denial of a Fair Trial by Fabricating Evidence, Withholding Material
Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a
Constitutionally Adequate Investigation**

*Against All Individual Defendants*

133.   Plaintiff incorporates by reference all of the foregoing paragraphs here within.

134.   The individual Defendants, acting individually and in concert, and within the

scope of their employment with the PPD, deprived Mr. Musier of his clearly

established constitutional rights to due process of law and to a fair trial by fabricating

inculpatory evidence and deliberately using coercion and/or suggestion to obtain

inculpatory witness statements, including, without limitation, the recanted and

inconsistent statements of Austin and Lewis, who states Detective Burns offered him

help with his then-open criminal cases in exchange for his testimony.

135. The individual Defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Mr. Musier of his right to a fair trial by withholding material exculpatory and impeachment evidence pursuant to *Brady* from prosecutors and defense counsel, including, without limitation, numerous witnesses and leads and/or their statements, such as Griffin's interview, in which she tells Defendants that Slater was the shooter and that his motive was drug-related; David Powell, who states he told Defendants that he was with Slater the day of the murder and Slater was wearing the green shirt; and Lewis' impeachment evidence that he was receiving government benefits in exchange for his testimony.

136. The individual Defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Mr. Musier of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including, without limitation, by failing to pursue exculpatory information from numerous witnesses, which is detailed throughout Mr. Musier's PCRA filings.

137. The individual Defendants, acting individually and in concert, and within the scope of their employment with the PPD, intentionally performed the above-described acts under Pennsylvania state law with reckless disregard for the truth and deliberate indifference to Mr. Musier's clearly established constitutional rights under both state and federal law. No reasonable PPD Officer from 2008 to 2012 would have believed this conduct was lawful.

138. Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Musier's injuries. Defendants knew, or should have

known, their unlawful conduct would result in Mr. Musier's wrongful arrest,

prosecution, first-degree murder conviction, sentence to life-without-parole, i.e. death,

17 years of incarceration, and debilitating injuries.

## COUNT II: 42 U.S.C. § 1983 Civil Rights Conspiracy

*Against All Individual Defendants*

139.   Plaintiff incorporates by reference all of the foregoing paragraphs here within.

140.   The individual Defendants, acting within the scope of their employment and under

Pennsylvania state law, agreed amongst themselves and with other individuals, to act

in concert to deprive Mr. Musier of his clearly established Fourth, Fifth, Sixth, and

Fourteenth Amendment rights to be free from unreasonable search and seizure, false

arrest and imprisonment, and deprivation of liberty without due process of law and a

fair trial.

141.   In furtherance of the conspiracy, the Defendants engaged in and facilitated

numerous overt acts, including, without limitation, the following:

  a. Suggesting, coercing, and/or fabricating inculpatory evidence in the

     form of witness statements and testimony (e.g. Lewis' testimony);

  b. Intentionally, or with deliberate indifference, failing to comply with

     their duty to disclose *Brady* and impeachment material during the

     pendency of the investigation and trial; and

  c. Committing perjury during pretrial hearings and/or trials.

142.   Defendants' acts and omissions, as described in the preceding paragraphs, were the

direct and proximate cause of Mr. Musier's injuries. Defendants knew, or should have

known, that their unlawful conduct would result in Mr. Musier's wrongful arrest,

prosecution, first-degree murder conviction, sentence to life-without-parole, i.e. death, 17 years of incarceration, and debilitating injuries.

### COUNT III: 42 U.S.C. § 1983 Failure to Intervene

*Against All Individual Defendants*

143.   Plaintiff incorporates by reference all of the foregoing paragraphs here within.

144.   By their conduct and under Pennsylvania state law, the individual Defendants, acting within the scope of their employment with the PPD, had opportunities to intervene on behalf of Mr. Musier to prevent his false arrest and prosecution, wrongful conviction and sentence to life imprisonment, deprivation of liberty without due process of law, and the right to a fair trial; but, with deliberate indifference, Defendants declined to do so.

145.   Defendants' failure to intervene at all stages of Mr. Musier's prosecution violated Mr. Musier's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth, Fifth, and Fourteenth Amendments, as well as his right to a fair trial and the right to fully and fairly confront witnesses under the Sixth Amendment.  No reasonable PPD Officer from 2008 to 2012 would have believed that failing to intervene to prevent coercion and fabrication of inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements used in trial, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Musier to be wrongfully tried, convicted, and sentenced, were lawful.

146.   Defendants' acts and omissions, as described in the preceding paragraphs, were

the direct and proximate cause of Mr. Musier's injuries. Defendants knew, or should have known, that their unlawful conduct would result in Mr. Musier's unlawful trial, first-degree murder conviction, sentence to life-without-parole, i.e. death, 17 years of incarceration, and debilitating injuries.

### COUNT IV: 42 U.S.C. § 1983 Supervisory Liability Claim

*Against Defendant City of Philadelphia*

147.    Plaintiff incorporates by reference all of the foregoing paragraphs here within.

148.    Defendant PPD Officers acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by PPD or the City of Philadelphia, both in Mr. Musier's case and as a matter of practice and custom.

149.    Defendant City of Philadelphia acted recklessly and with deliberate indifference to Mr. Musier's constitutional rights by failing to adequately train, supervise, and discipline the Defendant PPD Officers assigned to this investigation, thereby allowing and causing these officers to deprive Mr. Musier of his clearly established constitutional rights, including his rights to be free from unreasonable search and seizure, false arrest and imprisonment, and deprivation of liberty without due process of law and the right to a fair trial.

150.    Defendant City of Philadelphia was personally involved in the investigation of Mr. Musier by directly supervising the investigative acts taken by the Defendant PPD Officers in this case.

151.    The reckless and deliberately indifferent conduct of Defendant violated its clearly established duty to supervise the Defendant PPD Officers. No reasonable police supervisor in 2008 to 2012 would have believed that reckless and deliberately

indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

152.    Defendant's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Musier's injuries. Defendant City of Philadelphia knew, or should have known, that their conduct would result in Mr. Musier's unlawful arrest, prosecution, conviction, sentence, and incarceration

**COUNT V: 42 U.S.C. § 1983 Municipal Liability Claim**

*Against Defendant City of Philadelphia*

153.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs here within.

154.    The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Musier's wrongful arrest and conviction, as well as for many years preceding this investigation, a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the use of coercive techniques in interviews and interrogations to obtain witness identifications; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and defendants by coercion, suggestion, and feeding details about the crime; and the deliberate withholding of exculpatory evidence before and during trial.

155.    Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but Defendant repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain identifications; withholding exculpatory evidence; fabricating inculpatory evidence; and, particularly, fabricating

incriminating statements from witnesses, suspects, and defendants by coercion, suggestion, and feeding details about the crime. Defendant failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

156.  Such unconstitutional municipal customs, practices and/or policies were the moving force behind the coerced or fabricated testimony from Lewis, as well as the unlawful lack of disclosure of a multitude of exculpatory witnesses, causing Mr. Musier's unlawful arrest,  prosecution, murder conviction, de facto death sentence, and 17 years of incarceration, as well as all the other injuries and damages set forth above.

### COUNT VI: Intentional Infliction of Emotional Distress

*Against All Individual Defendants and the City of Philadelphia*

157.  Each of the foregoing paragraphs is incorporated as if restated fully herein.

158.  The acts and conduct and/or omissions of Defendants, as set forth above, were extreme and outrageous. Their actions were rooted in an abuse of power and authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Musier, as fully alleged above.

159.  As a direct and proximate result of Defendants' actions and conduct and/or omissions, Mr. Musier suffered and continues to suffer physical injury, mental anguish, and severe emotional distress.

### COUNT VII: Negligent Infliction of Emotional Distress

*Against All Individual Defendants and the City of Philadelphia*

160.  Each of the foregoing paragraphs is incorporated as if restated fully herein.

161.  The acts and conduct and/or omissions of Defendants, as set forth above, were

extreme and outrageous. Their actions were rooted in an abuse of power and authority,

and they were undertaken with intent to cause, or were in reckless disregard of the

probability that their conduct would cause, or, in the alternative, were negligent,

causing severe emotional distress to Mr. Musier, as fully alleged above.

162.   As a direct and proximate result of Defendants' actions and conduct and/or

omissions, Mr. Musier suffered and continues to suffer physical injury, mental anguish,

and severe emotional distress.

## DEMAND FOR DAMAGES

**WHEREFORE**, Plaintiff, Mr. Musier, respectfully demands judgment in his favor

against the Defendants jointly and/or severally: compensatory damages in an amount equal to or

in excess of **thirty million dollars ($30,000,000.00)**; punitive damages; attorneys' fees and

costs; and any and all other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, Mr. Musier, demands a trial by jury on all issues and claims set forth in this

Complaint pursuant to the Seventh Amendment of the United States Constitution and the Fed. R.

Civ. P. 38(b) on all triable issues of fact.


Dated: February 13, 2026                    Respectfully submitted,


                                            /s/ *Melissa Kucemba*
                                            Melissa Kucemba, Esq.
                                            Attorney ID # 336446
                                            Melissa Kucemba Attorney of Law, LLC
                                            1500 John F Kennedy Blvd., Suite 1900
                                            Philadelphia, PA 19102
                                            Email: melissakucemba@gmail.com
                                            Phone: 202-827-6946
                                            *Counsel for Plaintiff Tyree Musier*

## <u>VERIFICATION</u>

I, MELISSA KUCEMBA, ESQUIRE, hereby verify that all the information contained in Plaintiff's Civil Action Complaint are true and correct to the best of my knowledge, information and belief. I understand that this verification is made subject to 18 Pa. C.S. § 4904, providing criminal penalties for unsworn falsification to authorities.


Date: February 13, 2026                          /s/ *Melissa Kucemba*
                                                 Melissa Kucemba, Esq.
                                                 Attorney ID # 336446
                                                 Melissa Kucemba Attorney of Law, LLC

## **VERIFICATION**

I, TYREE MUSIER, PLAINTIFF, hereby verify that all the information contained in Plaintiff's Civil Action Complaint are true and correct to the best of my knowledge, information and belief. I understand that this verification is made subject to 18 Pa. C.S. § 4904, providing criminal penalties for unsworn falsification to authorities.

Date: February 11, 2026

/s/ _____
TYREE MUSIER

PLAINTIFF

# EXHIBIT A

Blanche Griffin Affidavit

## DECLARATION OF BLANCHE GRIFFIN

I, Blanche Griffin, do hereby swear and declare that the following is true and correct to the best of my knowledge, information and belief subject to the penalties for unsworn falsification to authorities set forth in 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904.

1. My name is Blanche Griffin. My date of birth is July 1, 1966. My address is 1414 N. Etting Street, Philadelphia, PA 19121.

2. I have been close friends with Annette Musier for 40 years. I've known Tyree Musier since he was born.

3. Sometime around 2012-2013, I spoke with Ms. Crystal Collins near her house on the 2900 block of Thompson Street in North Philadelphia. Crystal is the mother of Hafees Alston, who was in the car with Tyree and Jonte Slater (who I also know as "Pop-a-Colla") when they went to the area of 39th and Market Streets in West Philadelphia on the night of the murder. Hafees (who I know as "Hafa") saw everything and knows that Jonte, and not Tyree, was the shooter. I told Crystal, "It's a shame what your son did," meaning that he knew that Jonte was the shooter but wasn't coming forward to help Tyree. She told me that Hafa told her that Jonte was the one who pulled the trigger, not Tyree. This was the first time she told me that.

4. I believe it was a few weeks or months after Jonte was murdered when Jonte's father, William, came to Annete Musier's house when I was there. He told Annette

that he knew that Jonte did that murder at 39th and Market. He apologized to Annette that Tyree was doing life for a killing that his son Jonte committed. Annette told him that he was coming forward now only because his son was dead and that he should have come forward earlier and told this to Tyree's lawyer. He responded, "I know."

5. Annette also told me that the mother of Jonte's child came to her house one day and told Annette that Jonte told her that he was the one who killed the boy at 39th and Market and that Tyree was just in the car.

6. I was interviewed by police in 2010, when they brought me down to 8th and Race from the county jail. The police thought I might know something about Jonte's murder. I told the detective that Tyree was in jail for something he didn't do. I told the police that Jonte was the shooter and that everybody knew it. The word on the street from so many people was that Jonte, not Tyree, was the shooter. Jonte was a serious hothead. He even beat up his own father and stepmother. He had a whole lot of enemies. My understanding is that the victim of the 39th and Market shooting owed Jonte money for drugs and that's why, or at least one of the reasons, Jonte killed him.

*Blanche Griffin*
Blanche Griffin

Dated: _5-17-24_

# EXHIBIT B

Terrell Lewis Affidavit

## SUPPLEMENTAL DECLARATION OF TERRELL LEWIS

I, Terrell Lewis, do hereby swear and declare that the following is true and correct to the best of my knowledge, information and belief subject to the penalties for unsworn falsification to authorities set forth in 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904.

1. I was a Commonwealth witness at the homicide trial of the defendant in *Commonwealth v. Tyree Musier*. I also gave two statements to the police, one in June of 2008 and one in June of 2009. I am presently incarcerated at SCI Forest under inmate number LL 4963. My date of birth is May 21, 1986.

2. My testimony at Mr. Musier's trial was true. When I was asked whether I saw the shooter in the courtroom, I said no – because the shooter was not in the courtroom. The person who was in the courtroom was not the shooter.

3. I did not know any of the males who came to the scene that night. I never knew Jonte Slater, Tyree Musier or Hafees Alston and still don't know any of them. I only saw two males that night and both of them were strangers to me. If there was a third male I never saw him. The first time I saw these two males was when they were coming out of a house at 39th and Market Streets, right before the shooting. I never saw them go into the house and I never saw them drive up in a car or get out of the car. I only saw them come out of the house and jump into the car after the shooting. I believe the shooter jumped into the driver seat.

4. When the police brought me to 38th and Sansom Streets to look at the people they stopped, the only reason I identified the person as the shooter was because he was sitting next to the green shirt I saw the shooter wear. I may well have made an honest mistake and am willing to admit that. This is not a situation where I identified the correct person and then got scared and wanted to take that back. No one has put any pressure on me at all to take back my identification. I just thought the guy I identified was the shooter because I thought the green shirt next to him was his. I never got a good look at the face of the shooter.

5. At some point after the shooting, Latasha Austin, who I did know, told me that she lied to help Jonte Slater out, because she knew Jonte.

Terrell Lewis

Dated: 10/15/24

# EXHIBIT C

ADA Bretschneider Memorandum

## INTEROFFICE MEMORANDUM

TO:           NEXT ADA

FROM:         JEN BRETSCHNEIDER

SUBJECT:      TYREE MUSIER

DATE:         6/29/2011

Hi –

This case needs a lot of attention. Please call me about this. In short, the defendant and Jontae Slater were standing next to a car near Penn. The defendant, who was wearing a lime green shirt, got into a fight and shot and killed the decedent. They jumped into the car. The defendant in the passenger seat and Jontae Slater as the driver. Penn police miss seeing the shooting by seconds but see the car, surround it and follow it when it takes off. They see the gun tossed from the car. They pull the car over and the green shirt is in the console. Two witnesses come and identify Tyree Musier as the shooter. They arrest him and Jontae Slater (Jontae drove). Jontae Slater is DLOEd at the PH and gets executed shortly thereafter. Carl Watkins has that case. One of the witnesses in that case says that word on the street is he committed the murder near Penn and was letting Tyree take the fall. Then, the gun and the green shirt do not link up to Tyree. The gun comes back to no

~~The~~ The gun links up to
No one – Not

UNDISCLOSEDFILES 002

*WRONG*

one but the shirt comes back to Jontae as being
included in the source. Once the DNA comes back
Danny Alva says his client is innocent. Jimmy Burns
and I went to our one eyewitness who now says that she
didn't see Tyree Musier commit the murder. I passed
that information.    The witness is in a placement in
Pittsburgh so if it looks like she is still there we need to
bring her in. The family of the decedent is aware of
what is going on. We need to follow up with the DNA
which is supposed to be done some time in July. Also, I
started to listen to prison calls but an intern will need to
help out. So far Tyree Musier is telling his mom that he
was on his way to the car and something went wrong
and he was in the wrong place at the wrong time.
Danny Alva is starting to call Ann a lot about this.
Also, the male witness gave a false name so we brought
down a man who had nothing to do with this murder
and when he went south on the stand began to Brady
him thinking he was just south....he was not.    The
eyewitness had lied about his identify.

*WORSE*

*WRONG;*
*a ≠ excluded*
*is*
*Different!*
*than*
*+ 3 "included" fucking sources*

*so they all shared shirt.*

*DONE*

*+ Jim Griffin came to ct. + # ID'D wrong man (in ct. room + on record) as interviewed witness.*

Thanks!

Please call me with any questions (215) 292-2238.

Jen

2

# EXHIBIT D

*Musier v. MHM, Inc., et al.*, 1:23-cv-01047-YK-LT, "Memorandum," at 1 (Jan. 18, 2024).

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|                              |   |                      |
|------------------------------|---|----------------------|
| **TYREE MUSIER,**            | : |                      |
| **Plaintiff**                | : |                      |
|                              | : | **No. 1:23-cv-01047**|
| **v.**                       | : |                      |
|                              | : | **(Judge Kane)**     |
| **MHM, INC., et al.,**       | : |                      |
| **Defendants**               | : |                      |

## MEMORANDUM

This is a prisoner civil rights case filed pursuant to 42 U.S.C. § 1983 in which pro se Plaintiff Tyree Musier ("Musier") alleges that Defendants have violated his rights under the Eighth and Fourteenth Amendments by placing him in solitary confinement and denying him drug treatment. Presently before the Court is Defendants' motion to dismiss Musier's complaint. (Doc. No. 3.) For the following reasons, the motion to dismiss will be granted and Musier's complaint will be dismissed without prejudice.

## I.   BACKGROUND

Musier filed the complaint that initiated this case on May 1, 2023 in the Huntingdon County Court of Common Pleas. (Doc. No. 1-3.) According to the complaint, Musier has a well-documented history of substance abuse, both before and after his incarceration. (Id. at 3.) The complaint alleges that, in August 2017, while Musier was incarcerated at Huntingdon State Correctional Institution ("SCI-Huntingdon"), he was found with crushed Xanax in his possession and was given a misconduct citation for possession of contraband, which resulted in him spending thirty-four (34) days in SCI-Huntingdon's Restricted Housing Unit ("RHU"). (Id. at 4.) After exiting the RHU, Musier allegedly became the target of cell searches at least once a week from 2017 to 2022. (Id. at 5.) Musier sought drug treatment several times between 2017



and 2022, but the complaint alleges that prison staff repeatedly told him that he is not eligible for drug treatment because he is serving a life sentence. (Id.)

Sometime in 2022, prison staff allegedly found "orange strips with green markings on them" in Musier's possession. (Id.) An officer in SCI-Huntingdon, Lieutenant Corley ("Corley"), requested that Musier remain in the RHU pending the results of lab testing on the strips. (Id.) Musier allegedly suffered a panic attack due to the stress of remaining in the RHU on September 11, 2022, which resulted in him being transferred to an outside hospital for treatment. (Id.) During the hospital stay, hospital staff informed Musier that he had contracted clostridioides difficile ("C. diff."), a potentially dangerous bacterial infection. (Id.) The complaint alleges that Musier contracted C. diff. as a result of eating meals from the prison's provided meal trays. (Id. at 5–6.) Musier remained hospitalized from September 11, 2022 to September 27, 2022. (Id. at 6.)

On September 12, 2022, the orange strips purportedly tested positive for the presence of Suboxone. (Id.) Corley issued Musier a misconduct citation, but because of his hospitalization he was not served with the citation until September 28, 2022. (Id.) The matter was referred to Defendant Ellenberger ("Ellenberger"), a disciplinary hearing officer, for a hearing on September 30, 2022. (Id.) Ellenberger allegedly falsified documents to indicate that Musier pleaded guilty to the misconduct charge. (Id.) Ellenberger sentenced him to 120 days of disciplinary custody. (Id.) Halfway through this sentence, Musier submitted a request to a Program Review Committee ("PRC") in which he requested that the "PRC Defendants" give him "half-time." (Id.) The "PRC Defendants" denied this request. (Id.) Musier subsequently requested that he be placed in drug treatment, but the PRC allegedly told him that drug treatment

was not available for inmates serving life sentences and was reserved for inmates who were eligible for parole or release in the near future. (Id. at 7.)

On December 21, 2022, an officer in SCI-Huntingdon, Sergeant Chamberlain ("Chamberlain"), purportedly requested that Musier be transferred to administrative custody based on concerns that Musier was in danger from other individuals in the prison. (Id.) The "PRC Defendants" transferred Musier to administrative custody based on this request. (Id.)

Musier was transferred from SCI-Huntingdon to Fayette State Correctional Institution ("SCI-Fayette") on January 26, 2023. (Id. at 8.) He was immediately placed in SCI-Fayette's RHU. (Id.) On February 2, 2023, Musier was informed by RHU staff that he was awaiting "DEMO unit approval." (Id.) The complaint alleges that placement in the DEMO unit will result in Musier being placed in solitary confinement. (Id. at 9.)

The complaint asserts claims for violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, medical malpractice, and falsification of documents. (Id. at 10.) Musier seeks damages and injunctive relief. (Id. at 11.)

On May 22, 2023, the Court of Common Pleas conducted an in forma pauperis screening review of Musier's complaint and dismissed all claims other than Musier's Eighth Amendment deliberate indifference claim, his Fourteenth Amendment equal protection claim, and his medical malpractice claim against Defendants MHM, Inc. and Cousins. (Doc. No. 1-3.) On June 2, 2023, Defendants Pennsylvania Department of Corrections ("DOC"), Little, Rivello, Kohler, Spyker, House, Strait, McCloskey, Eberling, and Ellenberger ("DOC Defendants") were served with process. (Doc. No. 1 at 3.) DOC Defendants removed the case to the United States District

Court for the Middle District of Pennsylvania on June 23, 2023, and the case was assigned to the undersigned.  (Id.)

DOC Defendants moved to dismiss the complaint on June 29, 2023, and filed a brief in support of the motion on July 14, 2023.  (Doc. Nos. 3–4.)  Musier has not responded to the motion and the deadline for doing so has expired under the Local Rules.  See M.D. Pa. L.R. 7.6. The motion is accordingly ripe for judicial resolution.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that their claims are facially plausible.  See Iqbal, 556 U.S. at 678; Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  The plausibility standard requires more than a mere possibility that the

4

defendant is liable for the alleged misconduct: "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" See Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, the Third Circuit has identified the following steps that a district court must take when reviewing a 12(b)(6) motion: (1) identify the elements that a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint that are "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Township, 629 F.3d 121, 130 (3d Cir. 2010) (internal citations and quotation marks omitted).

The Third Circuit has specified that in ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). An undisputedly authentic document attached as an exhibit to a motion to dismiss by a defendant may be the basis to grant the motion to dismiss if the contents of the document contradict the plaintiff's allegations. See Pension Benefit Guar. Corp., 998 F.2d at 1196 (noting that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document" because "otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied").

In the context of pro se prisoner litigation, the Court must be mindful that a document filed pro se is "to be liberally construed." See Estelle v. Gamble, 429 U.S. 97, 106 (1976). Pro se complaints, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle, 429 U.S. at 106).

### B.      Section 1983 Standard

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Id. "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284– 85 (2002)). To state a cause of action under Section 1983, a plaintiff must allege that: (1) the conduct complained of was committed by persons acting under color of state law; and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States. See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).

## III.  DISCUSSION

### A.  Musier's Complaint

As noted above, the only claims that survived the Court of Common Pleas' screening of Musier's complaint are: (1) Musier's Eighth Amendment deliberate indifference claim; (2) Musier's Fourteenth Amendment equal protection claim; and (3) Musier's medical malpractice claim, which is asserted against Defendants MHM, Inc. and Cousins only.  It appears that MHM, Inc. and Cousins may not have joined in the removal of this action from state court and accordingly have not responded to the complaint or otherwise participated in the case since it was removed.[1]  The Court's analysis will accordingly proceed solely as to the deliberate indifference and equal protection claims given that the malpractice claim is asserted against MHM, Inc. and Cousins only.

Claims of deliberate indifference to a risk of harm require a plaintiff to show: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was deliberately indifferent to that risk; and (3) the defendant's deliberate indifference caused the plaintiff harm.  See Bistrian v. Levi, 696 F.3d 352, 366 (3d Cir. 2012) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)), abrogated in nonrelevant part as recognized by Mack v. Yost, 968 F.3d 311, 319 n.7 (3d Cir. 2020).  The first element is an objective inquiry of whether the official "knowingly and unreasonably disregarded an objectively intolerable risk of harm." See Beers-Capitol v. Wetzel, 256 F.3d 120, 132 (3d Cir. 2001).  The second element is

---

[1]  Although all defendants must consent to remove a case to federal court pursuant to 28 U.S.C. § 1441, failure of all defendants to consent to removal is a procedural defect to removal that may be waived by a plaintiff's failure to timely move to remand the case to state court rather than a jurisdictional defect to removal that may be raised by the court sua sponte.  See Balazik v. Cnty. of Dauphin, 44 F.3d 209, 213 (3d Cir. 1995).  Accordingly, because Musier has not moved to remand the case to state court, any failure by MHM Inc. and Cousins to consent to removal cannot be the basis for this Court to sua sponte remand the case to state court.  See id.

subjective: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." See Bistrian, 696 F.3d at 367 (quoting Beers-Capitol, 256 F.3d at 125).

Although Musier does not specifically state the basis for his deliberate indifference claim, the Court liberally construes the complaint as asserting two possible bases for a deliberate indifference claim—Musier's placement in solitary confinement for multiple months and his C. diff. infection. Neither is sufficient to state a deliberate indifference claim on which relief may be granted because the complaint fails to allege Defendants' personal involvement. A defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation. See Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 289 (3d Cir. 2018). The defendant's personal involvement cannot be based solely on a theory of respondeat superior. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, for a supervisor to be liable for the actions of a subordinate, there must be allegations of personal direction or actual knowledge and acquiescence. See id.

Here, Musier alleges that he spent multiple months in solitary confinement, but states that the decision to keep him in solitary confinement was made by the "PRC Defendants," a class of defendants that Musier does not define anywhere in the complaint. See (Doc. No. 1-2 at 6–9). Although Musier additionally alleges that the Pennsylvania Department of Corrections ("DOC") is responsible for his placement in solitary confinement, see (id.), the DOC is not a proper defendant in a § 1983 action. See Curtis v. Everette, 489 F.2d 516, 521 (3d Cir. 1973); see also, e.g., Foye v. Wexford Health Sources, Inc. (3d Cir. 2017) (unpublished). Musier therefore fails to allege any proper defendants who were personally involved in the alleged violation of his civil rights under the Eighth Amendment.

8

Musier's complaint also fails to state a deliberate indifference claim to the extent it is based on his C. diff. infection.  The complaint alleges that Musier contracted C. diff. as a result of eating meals from prison meal trays, but he does not allege that any Defendants were aware of the meal trays being infected with C. diff.  See (Doc. No. 1-2 at 5–6).  Accordingly, Musier's deliberate indifference claim will be dismissed for failure to allege Defendants' personal involvement.

Turning to Musier's equal protection claim, the Equal Protection Clause of the Fourteenth Amendment states that no state may "deny to any person within its jurisdiction the equal protection of the laws."  See U.S. CONST. amend. XIV, § 1.  The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 475 U.S. 202, 216 (1982)).  The Equal Protection Clause does not forbid classifications, but the distinctions between classes of individuals "must be rationally related to a legitimate governmental purpose."  See Stradford v. Sec'y Pa. Dep't of Corrs., 53 F.4th 67, 73 (3d Cir. 2022) (quoting Cleburne, 473 U.S. at 446).  Rational basis review does not "require specific facts to justify the government's legitimate purpose; all it asks is whether a policy is rational[ly] based on 'any reasonably conceivable state of facts.'"  See id. (quoting F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)).

In this case, Musier's complaint fails to specifically state what facts give rise to the equal protection claim, but the Court liberally construes the complaint to allege that the decision to deny Musier drug treatment based on the fact that he is serving a life sentence violates his right to equal protection.  The Court will dismiss this claim for failure to state a claim upon which relief may be granted because the Court agrees with Defendants that "[t]he DOC policy to

9

prioritize drug treatment and other programming to inmates soon to be released or paroled is rationally related to the government interest in preparing those inmates for life in the community."  (Doc. No. 4 at 23–24.)

**B.**     **Leave to Amend**

Courts are cautioned that because of the applicable pleading standard, a plaintiff should generally be granted leave to amend before dismissing a complaint that is merely deficient.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).  The federal rules allow for liberal amendment in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits."  See Foman v. Davis, 371 U.S. 178, 182 (1962) (citations and internal quotations omitted).  The Court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment."  See id.  Based on the foregoing, the Court will grant Musier leave to file an amended complaint because the Court finds that amendment would be neither inequitable nor futile.

**C.**     **Musier's State Law Claim**

Finally, having determined that Musier's deliberate indifference and equal protection claims are subject to dismissal and that leave to amend is appropriate, the Court declines to consider Musier's state law malpractice claim against Defendants MHM, Inc. and Cousins at this time.  Because the Court has dismissed Musier's federal claims, it appears that it may be appropriate for the Court to decline jurisdiction over Musier's state law malpractice claim.  See 28 U.S.C. § 1367(c)(3) (stating that a district court "may decline to exercise jurisdiction" over a state law claim over which it is exercising supplemental jurisdiction if "the district court has

10

dismissed all claims over which it has original jurisdiction."). Any decision on whether to decline jurisdiction over the state law claim shall be deferred pending the possible filing of an amended complaint.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss, dismiss Musier's complaint without prejudice for failure to state a claim upon which relief may be granted, and grant Musier leave to file an amended complaint. An appropriate Order follows.


s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Tyree Musier

**DEFENDANTS**

City of Philadelphia, Philadelphia Police Department, Detective James Burns, Detective Carl Watkins, John Doe 1-5

**(b)** County of Residence of First Listed Plaintiff   Montgomery Co.
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Melissa Kucemba, Two Penn Center, 1500 John F Kennedy Blvd, # 1900, Philadelphia, PA 19102, 202-827-6946

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product    Product Liability | |    28 USC 157 |    3729(a)) |
| [ ] 140 Negotiable Instrument |    Liability   [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &    Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
|    & Enforcement of Judgment |    Slander    Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'    Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted |    Liability   [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
|    Student Loans | [ ] 340 Marine    Injury Product | |    New Drug Application | [ ] 470 Racketeer Influenced and |
|    (Excludes Veterans) | [ ] 345 Marine Product    Liability | | [ ] 840 Trademark |    Corrupt Organizations |
| [ ] 153 Recovery of Overpayment |    Liability   **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
|    of Veteran's Benefits | [ ] 350 Motor Vehicle   [ ] 370 Other Fraud | **LABOR** |    Act of 2016 |    (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle   [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract |    Product Liability   [ ] 380 Other Personal |    Act | **SOCIAL SECURITY** |    Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal    Property Damage | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise |    Injury   [ ] 385 Property Damage |    Relations | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury -    Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) |    Exchange |
| |    Medical Malpractice | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** |    Leave Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [x] 440 Other Civil Rights   **Habeas Corpus:** | [ ] 790 Other Labor Litigation | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate |    Income Security Act | [ ] 870 Taxes (U.S. Plaintiff |    Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/    Sentence | |    or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability |    Accommodations   [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -   [ ] 535 Death Penalty | **IMMIGRATION** |    26 USC 7609 |    Act/Review or Appeal of |
| |    Employment   **Other:** | [ ] 462 Naturalization Application | |    Agency Decision |
| | [ ] 446 Amer. w/Disabilities -   [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| |    Other   [ ] 550 Civil Rights |    Actions | |    State Statutes |
| | [ ] 448 Education   [ ] 555 Prison Condition | | | |
| |   [ ] 560 Civil Detainee - | | | |
| |    Conditions of | | | |
| |    Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause: Plaintiff files this complaint against Defendants for violating his constitutional rights and causing injuries pursuant to 42 U.S.C. § 1983 and 42 PA Cons. Stat. § 762 (2024) by withholding exculpatory evidence in a criminal trial.

**VII. REQUESTED IN COMPLAINT:**

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $   $30,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions):*   JUDGE _____ DOCKET NUMBER _____

DATE   02/12/2026

SIGNATURE OF ATTORNEY OF RECORD   /s/ Melissa Kucemba

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

10/2024

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: <u>Philadelphia, Pennsylvania</u>

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?                    Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?    Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?    Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?    Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply?    Yes ☐
   If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☑ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.* ***Federal Question Cases:***

☐ 1.  Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2.  FELA
☐ 3.  Jones Act-Personal Injury
☐ 4.  Antitrust
☐ 5.  Wage and Hour Class Action/Collective Action
☐ 6.  Patent
☐ 7.  Copyright/Trademark
☐ 8.  Employment
☐ 9.  Labor-Management Relations
☒ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief  **\*see certification below\***
☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

*B.* ***Diversity Jurisdiction Cases:***

☐ 1.  Insurance Contract and Other Contracts
☐ 2.  Airplane Personal Injury
☐ 3.  Assault, Defamation
☐ 4.  Marine Personal Injury
☐ 5.  Motor Vehicle Personal Injury
☐ 6.  Other Personal Injury *(Please specify)*:_____
☐ 7.  Products Liability
☐ 8.  All Other Diversity Cases:  *(Please specify)*_____
        _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☑ **does not** have implications beyond the parties before the court and ☐ **does** / ☑ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.